# RE TAXES HAWAII CONSOLIDATED RAILWAY, LIMITED.

## No. 2004.

Argued March 17, 1932.     Decided April 1, 1932.

### Perry, C. J., Banks and Parsons, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is an appeal from a decision of the territorial board of equalization, determining the valuation for taxation purposes as of January 1, 1930, of the taxable property of the Hawaii Consolidated Railway, Limited, an Hawaiian corporation. The taxpayer returned its property as an enterprise for profit at a valuation of $1,486,479.60. The assessor assessed it at a valuation of $2,230,185. A majority of the board valued the property at $1,698,316, and the minority at $2,054,651.10. The taxpayer owns and operates a standard gauge railway, with terminal and headquarters in Hilo, Hawaii, extending along the coast of North Hilo and Hamakua as far as Paauilo Mill, a distance of thirty-four miles, from Hilo to Olaa Mill, a distance of eight miles, from Olaa Mill to Glenwood, a distance of seventeen miles, from Olaa Mill to Pahoa, a distance of ten miles, to Kapoho an additional distance of four miles, from Kapoho to Kaueleau seven

miles further and from its terminal to Hilo wharf about one mile, or a total track of about eighty-one miles in length.

The Hilo Railroad Company, predecessor of the present taxpayer, was organized in 1899 and completed the first portion of its tracks in or about 1900 and the remainder from time to time in the three or four years next following. In 1916, after the company was found unable to earn sufficient net income to pay all the interest on its bonds, a reorganization was had and the Hawaii Consolidated Railway, Limited, was formed as a result of the reorganization. $2,575,000 of 7% preferred stock, cumulative, $700,000 of 6% preferred stock and $400,000 of common stock was issued. The preexisting bond issue of $4,500,000, bearing interest at 6%, was cut down to $2,500,000, bearing interest at 5%. Originally, also, there had been $4,500,000 of common stock, which was reduced and altered to the forms and amounts of stock already stated. In the process of reorganization and transfer from the original to the present company a judicial sale was had at which the property was purchased by the reorganizers, who were a committee representing the original bond-holders, at $1,000,000. Even as of 1916, however, this selling price is not entitled to much weight as an indication of the true value of the property sold, since there were no competitors in the field. The selling price could just as well have been fixed at a somewhat lower sum or at a higher sum.

Since the reorganization the company has regularly paid the interest on its bonds. The holders of the 7% cumulative preferred stock became entitled, from 1916 to the assessment date in 1930, to 98% of dividends if and when they should be earned, but received during that period only 22½%. Neither of the other two classes of stock earned or received any dividends during that period

and are, admittedly, without market value.

There may be said to be three main groups of sugar plantations that can possibly furnish substantial business to this railway. The first, represented by T. H. Davies & Company as agents, includes the Laupahoehoe, Kaiwiki, Hamakua Mill and Waiakea companies; the second, represented by C. Brewer & Company as agents, includes the Hilo Sugar, Onomea, Pepeekeo, Hakalau and Honomu. companies; the third, represented by American Factors, is composed of the Olaa Sugar Company alone. Sugar is the most important freight that offers, with molasses and lumber next in importance. The railway would seem to be not indispensable, in the hauling of the sugars, to any of the plantations. Other means of transportation are and have been in the past available to them, including as to the Hilo Sugar Company and the Waiakea Company transfer by scows and as to the others (except Olaa) transfer by steamers to the dock at Hilo. For many years the smaller steamers of the Inter-Island . Steam Navigation Company actually transferred all the sugar of most of these plantations along the Hamakua coast either to Honolulu or, later, to Hilo and at present steamers of the Matson Navigation Company take the sugar of the Honokaa Sugar Company from Honokaa direct to San Francisco. What has been done in the past by steamers can be done again in the future. Upon the evidence, it is also practicable for sugar to be hauled by motor trucks from each and all of the plantations to the dock at Hilo. Until 1920 the Brewer & Company plantations refused to have sugar hauled by the railway company. From 1920 until 1925 all of their sugars, as well as all of their incoming freights, were carried by the railway. In 1926 an increase of 15% in railway freight rates, authorized by the interstate commerce commission, caused the Brewer companies to threaten to withdraw all

of their freights. They did withdraw all of their inward freights and the railroad company felt compelled to reduce its freight charges 20% in the case of the Hilo Sugar and Onomea companies in order to retain those items of business.

Owing to competition by motor driven vehicles, the passenger business of the railway, which at first was considerable, has diminished year by year until now it is not of any great consequence.

Neither party to this controversy claims that the true value of the corporate property is to be found by ascertaining the values of the separate items. In other words, it is practically conceded that there is a value resulting from use of the several parts in combination greater than that which could be attributed to the several parts themselves.

So, also, the valuation of $6,500,000 attributed to the property of the corporation by the interstate commerce commission in 1926 is not of assistance in the case at bar. The commission in that instance was not seeking the full cash value of the property, as is required by our territorial laws for taxation purposes, but was seeking a value in conformity with principles laid down by federal laws for rate-fixing purposes.

The following table shows the result of the application of the stock sales method sometimes adopted by this court in other cases:

Stock Sales Method.

| | |
|---|---|
| 128,750 shares, 7% preferred, @ $8.50, | $1,094,375.00 |
| Less 10% for large sales, | 109,437.50 |
| | $ 984,937.50 |
| Bonds outstanding January 1, 1930, face value, | 2,196,700.00 |
| | $3,181,637.50 |

| | |
|---|---:|
| Current liabilities, | 128,015.97 |
| Value, before deducting nontaxables, | $3,309,653.47 |
| Deduct value of nontaxables, | |
| (as per assessor's Exhibit "C") | 456,927.79 |
| | $2,852,725.68 |
| Value, before deducting nontaxables, | $3,309,653.47 |
| Deduct value of nontaxables, as per taxpayer's return and its Exhibit "5-E," | 498,343.96 |
| Value of taxable property, | $2,811,309.51 |

The evidence shows that the last sale of a few shares of the stock in 1929 was at $8.50 per share, hence the use of that rate in the foregoing table. The evidence also shows, however, that the bonds sold in that year at not over $80. In view of the fact that the bonds were deemed to be worth less than their face value and of the further fact that in fourteen years the 7% preferred stock yielded only 22½% of dividends while being entitled to 98%, the inference is irresistible that those who paid as much as $8.50 per share for the 7% preferred stock did so for reasons that were purely speculative and not because they thought that it had a true cash value of $8.50. As repeatedly held by this court in matters of assessment, the conservative and not the speculative spirit should prevail. But little weight can be attached to the showing made by the stock sales method in this case.

While the treasurer of the Territory has at times received the bonds of this company as security for deposits of territorial moneys in local banks, it is clear from the evidence that the bonds have been received at their market value and not at par and subject always to the right on the part of the treasurer, upon a fall in market prices, to call for additional security.

It appears from the evidence that certain trustees as such hold bonds and even shares of stock in this company and that none of them have been judicially surcharged to any extent by reason of these holdings. It is not shown, however, that any of these trustees made the investments referred to. It may well be that the decedents or other creators of the trusts made the investments. Upon the undisputed evidence in the case at bar these bonds are certainly not proper for investment of trust funds.

In the application of the method of capitalization of profits, the facts and figures are as appear from the following tables:

## GROSS REVENUES

|  | 1926 | 1927 | 1928 | 1929 |
|---|---|---|---|---|
| Transportation, | $ 895,464.30 | $ 933,677.95 | $ 885,659.26 | $ 911,941.85 |
| Other railway operations, | 63,550.89 | 74,334.46 | 90,263.70 | 81,646.09 |
| Rent of buildings, | 2,198.10 | 1,448.50 | 1,564.00 | 1,594.00 |
| Interest on funds in bank, | 15,272.56 | 4,013.60 | 1,048.94 | 1,426.03 |
| Interest on other investments, |  | 16,406.34 | 21,807.71 | 20,583.07 |
| Joint facilities rent income, | 46,592.45 | 53,723.43 | 52,522.29 | 57,078.06 |
| Totals, | $1,023,078.30 | $1,083,604.28 | $1,052,865.90 | $1,074,269.10 |

## EXPENSES

|  | 1926 | 1927 | 1928 | 1929 |
|---|---|---|---|---|
| Operating Expenses, | $ 701,425.74 | $ 718,315.38 | $ 685,633.93 | $ 665,146.44 |
| Ry. Tax Accruals, | 53,584.29 | 86,895.70 | 118,547.34 | 73,311.16 |
| Income Deductions, | 1,749.00 | 843.14 | 16,567.48 | 1,737.75 |
| Bond Interest, | 113,725.00 | 112,640.28 | 112,432.58 | 110,892.51 |
| Totals, | $ 870,484.03 | $ 918,694.50 | $ 933,181.33 | $ 851,087.86 |

## PROFITS

| | 1926 | 1927 | 1928 | 1929 |
|---|---|---|---|---|
| Gross Revenues, | $1,023,078.30 | $1,083,604.28 | $1,052,865.90 | $1,074,269.10 |
| Expenses, | 870,484.03 | 918,694.50 | 933,181.33 | 851,087.86 |
| Balance, | $ 152,594.27 | $ 164,909.78 | $ 119,684.57 | $ 223,181.24 |
| Plus Bond Int., | · 113,725.00 | 112,640.28 | 112,432.58 | 110,892.51 |
| Profits, | $ 266,319.27 | $ 277,550.06 | $ 232,117.15 | $ 334,073.75 |

Net Income, after deducting bond int.,
    average, 4 years,                                       $165,092.46

Net Income, without deducting bond int.,
    average, 4 years,                                       277,515.05

---

Net Income, average for 4 years, without
    deducting bond interest,                         $277,515.05

Deduct net inc., average for 4 years,
    from nontaxables,                              20,139.56 ·

         Net income from taxables,            $257,375.49

Deduct net income from break-
    water rock haulage, average
    for 4 years (see below),       $27,543.39

Deduct back mail pay, $14,131.10,
    rec'd in 1929, average for 4
    years (see below),              3,532.77

Deduct tax exemptions for 1926
    and 1927 ($65,736.00),
    average for 4 years,         16,434.00    47,510.16

Net taxable income, in prospect for future,     $209,865.33

## IN RE BREAKWATER ROCK HAULAGE

| | |
|---|---:|
| Net profits, "after deducting all expenses," in 1926, | $ 30,333.47 |
| Net profits, "after deducting all expenses," in 1927, | 46,659.00 |
| Net profits, "after deducting all expenses," in 1928, | 45,744.33 |
| Net profits, "after deducting all expenses," in 1929, | 54,248.66 |
| | $176,985.46 |
| Average net profits, 4 years, | 44,246.36 |
| Less 17% taxes saved (12% Fed. & 5% Terr.) on same, | 7,521.88 |
| | $ 36,724.48 |
| And less taxes @ .0375 on $244,829, the capitalization of $36,724.48 @ 15%, | 9,181.39 |
| | $ 27,543.39 |

## MAIL REVENUES

| | |
|---|---:|
| Received in 1926, | $ 4,983.12 |
| Received in 1927, | 4,983.12 |
| Received in 1928, | 4,747.36 |
| Total, 3 years, | $14,713.60 |
| Average, 3 years, | $ 4,904.53 |
| Received in 1929, | $19,035.63 |
| Less average per year, | 4,904.53 |
| *Back* revenue received in 1929, | $14,131.10 |
| Average of last item, 4 years, | $ 3,532.77 (loss of revenue for future) |

The foregoing facts are ·all practically undisputed, although there are some slight variations between the figures set forth in the printed reports of the company and those given in the testimony of certain of the witnesses.

Referring to the foregoing table relating to the haulage of breakwater rock, the facts are that for some years preceding January 1, 1930, the railway enjoyed a favorable contract for the hauling of rock used in the construction of a breakwater at Hilo and derived therefrom large profits. The breakwater was completed shortly prior to the assessment date. The loss of the revenue from this source was certain. From the net profits ascertained by deducting the cost of the haulage from the gross proceeds there is further deducted in the table the saving of taxes, federal and territorial, resulting to the company from the loss of this revenue.

In 1929 the company received back pay due it for carrying the mail, in addition to pay for carrying done that year. The back pay thus received in that year is deducted in the proper table from the total revenues from that source in order to ascertain the correct prospective revenue for the future.

The prospective net taxable income, above found, of $209,865.33 should, we find upon the evidence adduced, be capitalized at the rate of 15%. The testimony is that many of the safer sugar plantation companies are capitalized at about 12½% and some of the less favored ones at 15% and at as high as 20%. The Oahu Railway & Land Company, apparently much more favorably situated financially than the present taxpayer, was capitalized by the assessor at 10%, although this fact is not of very great weight, since not all of the details of that corporation are now before this court. A witness who was entirely familiar with the facts relating to the taxpayer

testified that in his opinion the rate of capitalization in this instance should be "a good deal more than those others," meaning the sugar companies. The serious hazards of the sugar plantations upon which it depends for business necessarily affect also this railway company. In addition, it is subject to the peculiar hazards of its own, of losing at any time the important business of either of the two groups of plantations in the districts of Hilo and Hamakua. The undisputed evidence is that without the freights furnished by either one of these groups the railway cannot continue in business. Capitalizing, then, at 15% the profits which upon the evidence the railway may be expected to produce in the future, the valuation arrived at is $1,399,102.20, which is less than the amount of the return of $1,486,479.60.

If the income from "rent of buildings" (see schedule relating to "Gross Revenues") is safe and certain and should be capitalized at a rate as low, say, as 8%, the increase in capitalization would be only $9,923, which would not affect the result because the total would still be less than the amount of the return.

Average rents, $1,701.15, capitalized @ 15%=$11,341.00
Average rents, 1,701.15, capitalized @ 8%= 21,264.00

Difference,     $ 9,923.00

The appeal of the taxpayer and its return are sustained and the valuation of the property, as of January 1, 1930, is fixed at $1,486,479.60.

*H. T. Kay,* First Deputy Attorney General (*H. R. Hewitt,* Attorney General, with him on the briefs), for the assessor.

*C. S. Carlsmith* and *M. L. Carlsmith* (*C. W. Carlsmith* with them on the briefs) for the taxpayer.